# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

|  |  |  |
|---|---|---|
| GEORGE HARTMANN, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-4014-CV-C-NKL |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## ORDER

Before the Court are the Motion to Dismiss [Doc. # 41] and Motion for Summary Judgment [Doc. # 42] filed by Defendant, the United States of America. For the following reasons, the Court denies both motions.

## I.    Background

### A.    Facts Relevant to Plaintiff's Medical Treatment

Plaintiff George Hartmann, Sr., was a 61-year-old diabetic man when he underwent cataract surgery in his left eye on March 13, 2007, at the Harry S. Truman Memorial Veterans Administration Hospital ("VAH") in Columbia, Missouri. Dr. Maneesh Mehan was the operating surgeon, and Dr. Todd Theobald was the assisting and attending physician. During the surgery, a tear in the posterior capsule holding the lens occurred, which is a known potential complication of cataract surgery. The surgeon performed an anterior vitrectomy and the posterior chamber intraocular lens was placed in the ciliary sulcus. Dr.

Mehan noted that some lens material may have fallen posteriorly into the vitreous cavity. Immediately after the operation, the patient was made aware of the complication and the possible need for additional surgery by a retina specialist to remove the lens fragments.

On the first post-operative day, March 14, 2007, Dr. Mehan and the attending physician, Dr. Don Liu, visited Plaintiff Hartmann.  Plaintiff's visual acuity in his left eye was measured as counting fingers at two feet.  The left eye intraocular pressure ("IOP") was 38.  There was significant corneal edema.  The intraocular lens was in place.  Plaintiff was given a pressure-lowering drop and oral medication.  When returning to the clinic three hours later, his IOP was 14.

Plaintiff Hartmann was seen on the third post-operative day, March 16, 2007, by Dr. Mehan and the attending physician, Dr. Timothy D. McGarity.  Plaintiff denied seeing flashes of light but confirmed seeing floaters.  Plaintiff's visual acuity in his left eye was 20/200 and the IOP was normal at 16.  The doctors elected not to dilate the pupil to examine the fundus (retina).

On the fifth post-operative day, March 19, 2007, Dr. Mehan and Dr. John W. Cowden, the attending physician, examined Plaintiff Hartmann.  On that date, Plaintiff denied flashes, but continued to see floaters.  Visual acuity was 20/200 in the left eye, and the IOP was 9. A piece of lens material was noted in the anterior chamber of the eye, and the possibility that it was a nuclear fragment was documented.  The pupil was dilated and a retinal exam was performed.  Cortical – not nuclear – lens remnants were noted in the posterior chamber of the eye (vitreous) and the retina was attached.

Plaintiff Hartmann was next seen on March 28, 2007, by Dr. Mehan and the attending physician, Dr. Liu. Plaintiff reported blurred vision, but his visual acuity had improved to 20/70 with refraction. The IOP was normal at 19. There was still a small lens fragment in the anterior chamber. There was still mild, "1 - 2+", inflammation in the eye. Because the inflammation was "stable but persisting" the possible need for additional surgery was discussed with Plaintiff. Close follow-up was recommended.

Two days later, on March 30, 2007, Plaintiff Hartmann returned for follow-up. His visual acuity had improved to 20/40 with refraction and the IOP was 22. Dr. Mehan and Dr. Liu recommended continued observation.

On April 3, 2007, Plaintiff Hartmann returned for follow-up, at which time he was seen by Dr. Mehan and the attending physician, Dr. Frank Rieger. His visual acuity was 20/50 with refraction and the IOP was 19. Although the vision remained good, the eye continued to demonstrate a significant lens fragment in the anterior chamber, significant vitreous debris, and significant intraocular inflammation. As a result, Dr. Mehan and Dr. Rieger recommended a referral to a retina specialist for possible vitrectomy.

On April 12, 2007, Plaintiff Hartmann was seen by Dr. Mehan and Dr. Dean Hainsworth, a vitreous and retina specialist. His visual acuity remained relatively stable at 20/50 - 20/60 with refraction. Hartmann's IOP was elevated at 27. Diamox was restarted and Dr. Hainsworth scheduled a vitrectomy for May 2, 2007. Dr. Hainsworth disclosed that the proposed vitrectomy carried a risk of retinal detachment and loss of vision.

On April 20, 2007, Plaintiff Hartmann was seen for an eye pressure measurement. Hartmann's IOP was 25 and his visual acuity was 20/60.

On May 2, 2007, Plaintiff Hartmann underwent uncomplicated vitrectomy with Dr. Hainsworth. The next day, Plaintiff's visual acuity was 20/70 and his IOP was 27. His retina was attached and no vitreous lens fragments remained. On May 11, 2007, nine days after vitrectomy, Plaintiff's visual acuity was 20/50 and his IOP was 15.

Plaintiff Hartmann did well until he returned to the VAH and was seen by Dr. Mehan on June 22, 2007, with a complaint of a three-day history of a shade coming over his vision. He was diagnosed with a macula-off rhegmatogenous retinal detachment. Because Dr. Hainsworth was not available that day, the VAH sent Plaintiff to another vitreous and retina specialist in the community, Dr. Jerry Blair. Plaintiff was seen that day by Dr. Blair, who referred him back to the VAH for repair.

On June 25, 2007, Plaintiff Hartmann was again seen by Dr. Mehan. Dr. Mehan discussed Hartmann's case with Dr. Hainsworth, who scheduled the retina reattachment.

On June 29, 2007, Dr. Hainsworth saw Plaintiff Hartmann, confirmed the diagnosis of a macula-off rhegmatogenous retinal detachment and performed a pneumatic retinopexy to repair the retinal detachment.

On July 5, 2007, Plaintiff Hartmann was seen in follow-up, at which time his visual acuity was measured as counting fingers at six feet, and his IOP was 16. The retina was attached. On August 2, 2007, Plaintiff's visual acuity in his left eye was 20/200 and his IOP was 11. On September 7, 2007, Plaintiff's best corrected visual acuity was 20/60.

On October 5, 2007, Plaintiff Hartmann visited the VAH Emergency Room with complaints of dim vision and fairly acute scattered "blackness" in his left eye for the last four days. His visual acuity in his left eye was 20/200 and his IOP was 22. An optical coherence tomography ("OCT") showed mild thickening of the retina in Hartmann's left eye. The impressions of Dr. Tara G. Missoi and the attending physician, Dr. Liu, were questionable cystoid macular edema ("CME"), trace epiretinal membrane ("ERM"), and thickening of the retina.

On November 20, 2007, Plaintiff Hartmann's vision was "HM" (hand motion) without glasses, improving to 20/200 with glasses. His IOP was 19. Plaintiff was offered a fluorescein angiogram to evaluate the blood vessels of the retina, but he refused because of lack of time. Hartmann was scheduled to return in 2-3 weeks for the angiogram.

On December 4, 2007, Plaintiff's visual acuity was 20/200 in his left eye and his IOP was 23. The fluorescein angiogram was performed and showed no significant microaneurysms that would indicate diabetic retinopathy, but petaloid cystic macular edema staining was noted. A sub-tenon steroid was given for the left eye.

On February 5, 2008, Plaintiff Hartmann was seen for follow-up for the CME in his left eye. His visual acuity was 20/200 in the left eye and his IOP was 21. Hartmann reported that he felt his vision was better. No apparent cyst was seen on clinical exam. Another OCT exam was performed and showed mild thickening of the retina in his left eye. CME-visual acuity showed no improvement. A retina evaluation was scheduled.

On March 6, 2008, Dr. Hainsworth performed a retinal exam. Plaintiff Hartmann felt that his vision remained poor. His visual acuity was 20/400 in his left eye and his IOP was 25. The exam showed dry eye with irregular epithelium. A contact lens examination – to overcome haziness in the eye – indicated that the retina was all attached with no significant edema of the macula noted. Dr. Hainsworth's impression was previous retinal detachment, stable following pneumatic retinopexy; cystoid macular edema in the left eye minimally current; and glaucoma in the left eye. Dr. Hainsworth reviewed the OCT and reported that it showed mild thickening of the macula. Dr. Hainsworth recommended continuation of glaucoma drops and using frequent artificial tears. Plaintiff was to return in six months.

Plaintiff was not seen by the VAH after March 6, 2008. On September 22, 2009, Plaintiff was seen by Jeffrey Gamble, O.D., at the Mason Eye Institute. Plaintiff's best corrected visual acuity was 20/150 in the left eye, 20/70 in the right eye, and 20/70 for both eyes .

Dr. Gamble testified that at the time of the September 22, 2009 exam he assumed that the decreased vision in Plaintiff Hartmann's left eye was due to the macular coming off. He saw no other anatomical or physiological reason for the decreased vision. Dr. Gamble found no glaucoma or macular edema and recommended cataract surgery for the right eye.

Plaintiff Hartmann was seen by Dr. Gamble again on July 16, 2010, at Columbia Eye Consultants, Dr. Gamble's private office. At that time Hartmann's best corrected visual acuity was 20/80 in the left eye, and his IOP was 15. Dr. Gamble testified that he found no clinically significant macular edema of either eye.

Dr. Gamble testified that Plaintiff had unexplained vision loss in his left eye. He explained that he attempted to perform an OCT to look at the health of the macula, but the results were considered unreliable because of Plaintiff's inability to stay on point long enough to do the test. Dr. Gamble also explained that Plaintiff's loss of visual field was due to his drooping eyelid getting in the way. Later, Dr. Gamble explained that the OCT showed a normal macula with no CME. However, Dr. Gamble also explained that he does not interpret an OCT for diagnosis, but only for referral. He stated that if he saw any thickness or thinning in the macula he would refer the patient to a retina specialist who is equipped to diagnose. He did not refer Plaintiff Hartmann to a retina specialist because Hartmann had a normal OCT. Dr. Gamble also stated that in order to determine Plaintiff's unexplained vision loss, Plaintiff would need to be referred to a retina specialist.

Dr. Gamble also explained at his deposition that the Missouri law regarding the necessary vision for a driver's license was 20/40 for an unrestricted driver's license, up to 20/160 for a restricted driver's license. However, Dr. Gamble stated that it is not possible to obtain a driver's license with vision over 20/160.

## B.     Procedural History

### 1.     Administrative Claim

In its Motion to Dismiss, the United States alleges the following facts regarding Plaintiff's administrative claim. These facts are also undisputed.

On March 4, 2009, Hartmann submitted an administrative tort claim to the VAH, along with 111 pages of VAH medical records. The administrative claim was filed on

Standard Form 95. Standard Form 95 asks for the "Date and Day of Accident," which Hartmann filled in as "March 13, 2007." [Doc. # 41, Ex. C at 4.] The next box on Standard Form 95 asks for the "Time (A.M. or P.M.)" of the accident, and Hartmann filled in "9:37am-12:07pm" – the time of his cataract operation. *Id.*

The eighth box on the Standard Form 95 is titled "Basis of Claim" and instructs: "State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof." *Id..* In that box, Hartmann wrote:

> Claimant underwent cataract surgery at the Veterans Administration Medical Center in Columbia, Missouri which cataract surgery was negligently performed causing significant damage to his left eye requiring a vitrectomy for retained lens fragments on 5/2/07, the combination of which caused the claimant to have a retinal detachment of his left eye for which he underwent a pneumatic retinopexy on 6/29/07. The claimant is left with macular edema and significantly reduced visual acuity in the left eye.

*Id.* The tenth box on the form is titled "Personal Injury/Wrongful Death" and instructs: "State Nature and Extent of Each Injury or Cause of Death, Which Forms the Basis of the Claim." In that box, Hartmann wrote:

> See Field 8 above. Claimant alleges that the negligence of Drs. Maneesh K. Mehan, Todd Ashton Theobald and/or Frank G. Rieger, III resulted in the rupture of the capsule, loss of lens fragments necessitating the vitrectomy, the detached retina, and the macular edema, all resulting in loss of functional use of the left eye.

*Id.*

On August 6, 2009, attorney Mark McCloskey notified the Office of Regional

Counsel of the Department of Veterans Affairs that he was representing Hartmann in regard to the administrative claim. Hartmann did not amend his administrative claim.

On September 8, 2009, the Department of Veterans Affairs denied Hartmann's claim. The Department's regional counsel, Patrick Wiese, wrote to Plaintiff's counsel:

> We have performed a thorough investigation of this matter and requested the expert opinion of an Opthalmologist of a VA medical facility independent of the Harry S. Truman Memorial Veterans Hospital. Based upon all of the evidence collected, it is our conclusion that the treatment that your client received concerning the surgical procedures at issue was within the standard of care. The complications encountered by Mr. Hartmann are known complications of the surgical procedures at issue in this case, and he gave his informed consent to these procedures.

*Id.* at 7.

### 2.    Federal Tort Claim

On January 28, 2010, Plaintiff Hartmann filed his Complaint in this action, under the Federal Tort Claims Act ("FTCA"). The Complaint alleges that in rendering medical care and treatment to him, the United States failed to exercise the degree of care and learning ordinarily exercised by members of its profession under the same or similar circumstances, and was thereby negligent in that:

> (a) Defendant negligently failed to determine the presence of or appreciate the significance of the presence of retained lens fragments in Plaintiff's left eye after cataract surgery;
> (b) Defendant negligently failed to take prompt or urgent action to surgically correct and retrieve the retained lens fragments immediately following cataract surgery on March 13, 2007; and
> (c) Defendant negligently allowed an excessive length of time to transpire between the discovery or appreciation that lens fragments were retained in Plaintiff's left eye following cataract surgery, leading to glaucoma, delayed

vitrectomy, pneumatic retinopexy, and permanent disruption of Plaintiff's vision in his left eye.

[Doc. # 1 at ¶ 6.]  Plaintiff's Complaint also alleges that, as a direct and proximate result of one or more of those negligent acts or omissions, he suffered:

(a) the loss of vision in his left eye;
(b) Plaintiff was required to undergo otherwise unnecessary medical and surgical procedures and treatments;
(c) Plaintiff has suffered a severe and permanent interference in affairs of daily living, including loss of his driving privileges, loss of his ability to live independently, loss of wages in the past and loss of earning capacity in the future;
(d) Plaintiff has suffered from and will continue to suffer from egregious emotional pain and suffering as a result of his loss of vision;
(e) Plaintiff is at increased risk of injury and death as a result of his visual limitations;
(f) Plaintiff has suffered the cost of modifications to his means of transportation, household, and requirements of assistance in the affairs of daily living, routine medical care, and that entire constellation of damages, commonly referred to as "life care"; and/or
(g) Plaintiff has suffered from the past and will permanently suffer in the future a loss and/or reduction in his enjoyment of life.

*Id.* at ¶ 7.

Pursuant to the Court's Scheduling and Bench Trial Order, Plaintiff Hartmann was required to designate any expert witnesses he intends to call at trial on or before November 5, 2010.  On October 13, 2010, Plaintiff provided Defendant with his designation of Dr. Steven N. Cohen, an ophthalmologist, as his only expert.  Dr. Cohen's expert opinions were provided in a letter dated November 7, 2009, and a letter of addendum dated October 6, 2010.  During his deposition on October 28, 2010, Dr. Cohen testified that he did his residency in ophthalmology at the Wills Eye Hospital in Philadelphia, which is one of the

largest eye hospitals in America. Dr. Cohen testified that he became board certified in ophthalmology in 1979, which is the highest certification that can be achieved in general ophthalmology. Dr. Cohen has been engaged in the private practice of ophthalmology since 1978. He testified that he has performed cataract surgeries and anterior vitrectomies, amongst a variety of other surgeries related to the field of ophthalmology.

Dr. Cohen testified that it was his opinion that "given the suspicion of the intraoperative problem that was mentioned in the operative note, then the subsequent behavior of the eye in the follow-up visits, indicated that, obviously, something was wrong and should have been investigated with a lot more alacrity." [Doc. # 41, Ex. 2 at 29-30.] Dr. Cohen confirmed that his opinion of Dr. Mehan's negligence was based on the following definition of the standard of care for health care providers in Missouri: "the failure to use that degree of skill and learning ordinarily used under the same or circumstances [sic] by members of the defendant's profession." *Id.* at 29. Regarding causation, Dr. Cohen then testified as follows:

> Q. . . . [D]o you have an opinion to a reasonable degree of medical certainty as to whether or not the retinal detachment, the macula-off retinal detachment . . . was causally related to that delay in investigating and repairing the retained lens fragments?
>
> A. It's sort of a chain reaction. . . . [V]itrectomy alone can lead to a detached retina in probably a couple percent of the cases. And the pars plana vitrectomy has another additional risk of retinal detachment. So, the fragment, itself, won't cause a detached retina, but to deal with the fragment and the vitreous – those two procedures almost certainly led to the detached retina.
> . . .
> I can't say for sure [that the seven-week delay between the cataract surgery and the vitrectomy] was related to the detached retina, because the detached

retina is a consequence of the two procedures he had. But it probably contributed to his cystoid macular edema, which is, I suspect, the basis for his failure to recover anything better than 20/200.

. . .

I think the lens fragment itself did not cause the detached retina, but the loss of the lens fragment led to the procedures that caused the detached retina. But the loss of lens fragment being ignored for so long led to the unnecessary inflammation and cystoid edema in the eye.

. . .

I think [the delay] could have contributed to the retinal detachment and causing prolonged vitreous inflammation and additional contraction of the vitreous over that period of time, with traction on the retina.

Q. Once again, would you consider that to be more likely true than not?

A. Yes.

*Id.* at 30-33.

On December 6, 2010, Defendant provided to Plaintiff its designation of expert witnesses and the expert reports of Dr. Nancy Holekamp and Dr. Dean Hainsworth. Both doctors are ophthalmologists who did fellowships to become vitreous and retina specialists. Dr. Nancy Holekamp was retained by the United States to provide expert testimony in this case. Dr. Hainsworth works part-time at the VAH and was the vitreous and retina specialist who treated Plaintiff. Both Dr. Hainsworth and Dr. Holekamp opine that it is reasonable and within the standard of care in cases of retained cortical material with good vision and medically controlled eye pressure to wait for the referral to the vitreous and retina specialist. Dr. Holekamp also stated that Plaintiff's loss of vision in his left eye resulted from the macula-off retinal detachment.

**II.    Discussion**

## A.    Motion to Dismiss

Defendant United States first argues that Plaintiff Hartmann's civil action should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).

The district court has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1).  *Osborn v. United States*, 918 F.2d 724, 728 n.4 (8th Cir. 1990).  Considering matters outside the face of the complaint does not subject a Rule 12(b)(1) motion to the standards for summary judgment under Rule 56.  *Id.* at 729.  Plaintiff has the burden of establishing subject matter jurisdiction.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

Absent a waiver, sovereign immunity shields the United States and its agencies from suit.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  "Congress, of course, has waived its immunity for a wide range of suits, including those that seek traditional money damages. Examples [include] the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. . . . ." *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1991).  The FTCA waives sovereign immunity for tort claims against the United States arising from a negligent or wrongful act or omission of a government employee acting within the scope of employment.  28 U.S.C. § 2674. However, such a federal tort claim against the United States shall not be instituted unless the claimant shall have first presented the claim to the appropriate agency and his claim shall have been finally denied by the agency in writing.  28 U.S.C. § 2675(a).

The parties agree that, pursuant to this FTCA Section 2675 requirement, the claimant must provide the agency with sufficient information to investigate his claim, as well as the

amount of damages sought.  The United States cites *Farmers State Savings Bank v. Farmers Home Administration*, where the Eighth Circuit wrote:

> We have considered the notice requirement of section 2675 on several occasions.  *See Gross v. United States*, 676 F.2d 295 (8th Cir. 1982); *Lunsford v. United States*, 570 F.2d 221 (8th Cir. 1977); *Melo v. United States*, 505 F.2d 1026 (8th Cir. 1974).  These cases stand for the proposition that a claimant satisfies the notice requirement of section 2675 if he provides in writing (1) sufficient information for the agency to investigate the claims, *see Gross*, 676 F.2d at 299, and (2) the amount of damages sought, *see Lunsford*, 570 F.2d at 226; *Melo*, 505 F.2d at 1029.  This standard is in accordance with that adopted by other courts of appeals. *See GAF Corp. v. United States*, 818 F.2d 901, 919 (D.C. Cir. 1987); *Charlton v. United States*, 743 F.2d 557, 561 (7th Cir. 1984); *Warren v. United States Dep't of Interior Bureau of Land Management*, 724 F.2d 776, 780 (9th Cir. 1984) (en banc); *Johnson by Johnson v. United States*, 788 F.2d 845, 848 (2d Cir.), *cert. denied*, 479 U.S. 914, 107 S. Ct. 315, 93 L. Ed. 2d 288 (1986); *Lopez v. United States*, 758 F.2d 806, 809-10 (1st Cir. 1985); *Bush v. United States*, 703 F.2d 491, 494 (11th Cir. 1983); *Tucker v. United States Postal Serv.*, 676 F.2d 954, 959 (3d Cir. 1982); *Douglas v. United States*, 658 F.2d 445, 447 (6th Cir. 1981); *Adams v. United States*, 615 F.2d 284, 288-89 (5th Cir. 1980).
> . . .
> We have held that two prerequisites for administrative investigation are the identity of the claimants, *see Lunsford*, 570 F.2d at 226, and the nature of the claims, *see Melo*, 505 F.2d at 1029.

866 F.2d 276, 277 (8th Cir. 1989).

Here, there is no dispute that Plaintiff Hartmann provided the VAH with his identity and the amount of damages he sought when he filled out Standard Form 95.  Therefore, the only contested question is whether Hartmann also provided sufficient information for the agency to investigate his claim – i.e., whether he divulged the nature of his claim.  The United States argues that the negligence claim set forth in Hartmann's Complaint is so

distinct from the basis for his claim provided to the agency that the VAH had insufficient information to investigate the claim now before the Court.

As explained above, Standard Form 95's "Basis of Claim" box instructs the claimant: "State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof." [Doc. # 41, Ex. C at 4.] Hartmann filled that box with the following text:

> Claimant underwent cataract surgery at the Veterans Administration Medical Center in Columbia, Missouri which cataract surgery was negligently performed causing significant damage to his left eye requiring a vitrectomy for retained lens fragments on 5/2/07, the combination of which caused the claimant to have a retinal detachment of his left eye for which he underwent a pneumatic retinopexy on 6/29/07. The claimant is left with macular edema and significantly reduced visual acuity in the left eye.

*Id.* Plaintiff further described the "Nature and Extent of Each Injury or Cause of Death, Which Forms the Basis of the Claim" as follows:

> See Field 8 above. Claimant alleges that the negligence of Drs. Maneesh K. Mehan, Todd Ashton Theobald and/or Frank G. Rieger, III resulted in the rupture of the capsule, loss of lens fragments necessitating the vitrectomy, the detached retina, and the macular edema, all resulting in loss of functional use of the left eye.

*Id.*

In this civil action, Plaintiff Hartmann's Complaint alleges that his injuries were caused by Defendant's negligence:

> (a) Defendant negligently failed to determine the presence of or appreciate the significance of the presence of retained lens fragments in Plaintiff's left eye after cataract surgery;

(b) Defendant negligently failed to take prompt or urgent action to surgically correct and retrieve the retained lens fragments immediately following cataract surgery on March 13, 2007; and

(c) Defendant negligently allowed an excessive length of time to transpire between the discovery or appreciation that lens fragments were retained in Plaintiff's left eye following cataract surgery, leading to glaucoma, delayed vitrectomy, pneumatic retinopexy, and permanent disruption of Plaintiff's vision in his left eye.

[Doc. # 1 at ¶ 6.]

The United States contends that Hartmann has abandoned his administrative claim – that his doctors were negligent in performing the cataract surgery – because he now claims that those doctors were negligent in responding to the lens fragments in the days and weeks after the operation itself. In other words, the United States narrowly interprets Plaintiff's cataract surgery as lasting exactly 2 hours and 30 minutes, and that any negligence by the doctors outside of that window – i.e., in the post-operative stage – does not constitute the negligent performance of surgery, or "the negligence of Drs. Maneesh K. Mehan, Todd Ashton Theobald and/or Frank G. Rieger, III," originally alleged by Plaintiff. [Doc. # 41, Ex. C at 4.]

Despite acknowledging the general rule stated in *Farmers State Savings Bank* – that the notice requirement of Section 2675 requires sufficient information for the agency to investigate the claims – Defendant argues that three recent Eighth Circuit cases have applied that requirement with stringency.

First, in *McCoy v. United States*, the plaintiff filed an administrative claim alleging malpractice by the Bureau of Prisons that resulted in the amputation of his leg. 264 F.3d 792,

16

793 (8th Cir. 2001). The BOP rejected the claim as untimely, since the amputation occurred more than two years before McCoy filed his claim. However, McCoy then filed suit in federal court, arguing for the first time that the "continuing treatment" doctrine had tolled the limitations period. *Id.* at 794. McCoy had mentioned in his administrative claim only that since his amputation he had "suffered from repeated open sores in the stumps of both legs and he has undergone several procedures for debridement and revision of open areas on his stumps." *Id.* Yet he argued for the first time in federal court that the various treatments he received in the years since his amputation constituted continuous negligent treatment. The Eighth Circuit concluded in a footnote: "The district court determined that McCoy's administrative claim cannot be fairly read to encompass his failure to diagnose and treat claim. We do not find this determination to be clearly erroneous." *Id.* at 795 n.3 (citing *Walker v. United States*, 176 F.3d 437, 438 (8th Cir. 1999)).

Similarly, in its one-page *Walker* opinion, the Eighth Circuit wrote:

Which claims Walker presented in her administrative claim was a disputed factual question, and is reviewed for clear error. The district court's determination that the September 1993 leg fracture was the only claim presented is not clearly erroneous as the administrative claim listed September 7, 1993, as the date of the accident and the onset of pain.

176 F.3d at 438 (citation omitted). As in *McCoy*, the Eighth Circuit in *Walker* affirmed the district court's determination that the administrative claim was presented more than two years after the plaintiff should have become aware of the doctors' negligence, and that the FTCA suit therefore was barred by the limitations provision.

Finally, the United States relies on *Allen v. United States*, where the plaintiff had filed an administrative claim regarding her Hepatitis infection after a blood transfusion. 590 F.3d 541, 543 (8th Cir. 2009). The administrative claim alleged that the Air Force had negligently failed to screen the blood and had negligently failed to diagnose and treat her Hepatitis between 1997 and 2005. *Id.* Allen brought her civil action in 2007, alleging for the first time that the Air Force had never obtained her informed consent for the transfusion. *Id.* The Eighth Circuit held that the district court had no jurisdiction over the informed consent claim because it had not been made in Allen's administrative claim:

> While we will liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made. Even given a liberal reading, Allen's administrative charge did not make out a lack of informed consent claim and as a result she failed to exhaust her administrative remedies as to that claim.

*Id.* at 544 (internal quotations and citations omitted). The pro se plaintiff in *Allen* was attempting to introduce in her civil action a material fact which transformed her theory of recovery. Whereas her original theory was that the Air Force had negligently failed to screen the blood and to diagnose and treat her Hepatitis, she now claimed that the Air Force had not even obtained her informed consent for the transfusion in the first place.

The Court does not read any of these three cases as overruling *Farmers State Savings Bank*'s formulation of the Section 2675 notice requirement as "sufficient information for the agency to investigate the claims" – i.e., the identity of the claimants and the nature of the claims. 866 F.2d at 277 (8th Cir. 1989). Presumably, it is in light of this minimal notice

requirement that Standard Form 95 instructs claimants to merely provide the "Basis of Claim" – "the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof" – as opposed to discrete legal theories. By setting forth the basic material facts, claimants provide sufficient information for the agency to investigate their claims.

Occasionally, courts have construed administrative claim as insufficiently informative where, for example, a plaintiff later remembers convenient facts, or suddenly alleges years of continuing negligent treatment. Here, however, Plaintiff Hartmann has manufactured no new facts; nor did he task the VAH with finding a needle in a haystack, as Defendant implies. Plaintiff's claim is that the negligence of three specific VAH doctors caused the loss of vision in his left eye. Defendant emphasizes that Plaintiff "even identified the precise time of the act alleged to be negligent: 9:37 a.m. to 12:07 p.m., on March 13, 2007 – the precise time during which the cataract surgery was performed." [Doc. # 41 at 9.] To require that a claimant provide the date and time of the "accident" and then confine his claim to that window of time would fall far short of liberally construing an administrative charge for exhaustion of remedies purposes. *Allen*, 590 F.3d at 544.

Instead, a liberal construal of Plaintiff's administrative claim of negligent "cataract surgery" would put Defendant on notice to investigate follow-up treatment performed by the same allegedly negligent surgeon in the same month as the operation itself. [Doc. # 41, Ex. C at 4.] Indeed, the relevant definition of "surgery" in Webster's Dictionary provides two different meanings: "a. the work done by a surgeon . . . b. OPERATION." *Webster's Third*

*New Int'l Dictionary* 2301 (3d ed., 1971). Far from liberally construing Plaintiff's administrative claim, the United States asks the Court to read "cataract surgery" in its narrowest sense, meaning only the 2 hours and 30 minutes of the operation.

Yet the VAH itself appears to read Plaintiff's administrative claim more broadly, referring in its denial letter to "the surgical procedures at issue in this case . . . ." [Doc. # 41, Ex. C at 7.] Moreover, Plaintiff's administrative claim alleged negligence on the part of three specific VAH doctors: "Drs. Maneesh K. Mehan, Todd Ashton Theobald and/or Frank G. Rieger, III." *Id.* at 4. Dr. Frank Rieger became involved in the post-operative treatment of Plaintiff's left eye on April 3, 2007 – approximately 2 weeks after the operation itself. It was Dr. Mehan and Dr. Rieger who recommended referral to a retina specialist for the vitrectomy which ultimately took place on May 2, 2007. Any investigation of Dr. Rieger's role in treating Plaintiff Hartmann should have revealed these decisions.

In short, because Plaintiff Hartmann's administrative claim put the United States on notice of "the negligence of Drs. Maneesh K. Mehan, Todd Ashton Theobald and/or Frank G. Rieger, III," he has exhausted his administrative remedies and this Court has subject matter jurisdiction. *Id.*

### B. Motion for Summary Judgment

The United States also argues that summary judgment should be entered in its favor because (1) Plaintiff lacks admissible expert medical testimony necessary to establish a prima facie case, and (2) even if Dr. Cohen's opinions are admissible, Plaintiff still lacks sufficient evidence to meet his burden of proof.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Id.* at 248.

The parties here agree that it is Plaintiff's burden to prove that Defendant's acts or omissions were performed negligently and that negligence caused his injuries. *Boehm v. Pernoud, M.D.*, 24 S.W. 3d 759, 761 (Mo. App. 2000) (citation omitted). The parties also agree that Missouri law requires expert testimony in a medical malpractice case such as this. *Id.*; *Brickey v. Concerned Care of the Midwest, Inc.*, 988 S.W.2d 592, 596 (Mo. Ct. App. 1999).

### 1.    Defendant's *Daubert* Motion

Within its Motion for Summary Judgment, Defendant also moves to disqualify Plaintiff's expert, Dr. Cohen, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Pursuant to Rule 702, an expert's opinion must be based upon sufficient facts or data, be the product of reliable principles and methods, and apply the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. In *Daubert*, the Supreme Court set forth a general checklist for trial courts to use in assessing the reliability of scientific expert testimony, including:

(1) Whether the opinion can be or has been tested;
(2) Whether the opinion has been subjected to peer review and publication;
(3) Any known or potential rate of error of the methodology employed, and whether standards control the technique's operation; and
(4) The degree of general acceptance of the opinion or its methodology within the relevant field.

509 U.S. at 592-94. The reliability test is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

In *Daubert*, the Supreme Court envisioned "a gatekeeping role for the judge" vis-a-vis the jury regarding the admission of expert testimony. 509 U.S. at 597. In a bench trial, however, there is no jury to protect from allegedly unreliable expert opinions. As Judge Diane Wood of the Seventh Circuit has explained:

It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same – that is, the judge – the need to make such decisions prior to hearing the testimony is lessened. That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination

22

during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (citation omitted); *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Havrum v. United States*, No. 95-4207-CV-C-NKL, 1998 WL 35223750 *1, *9 (W.D. Mo., June 19, 1998) ("As this is a bench tried case, it is the opinion of this Court that addressing admissibility issues at the time of trial, rather than in a pre-trial hearing, would be the most efficient use of all of the resources involved.").

Defendant United States acknowledges that in a bench tried case, it is within the discretion of the Court to postpone the issue of admissibility until trial. However, the United States suggests that Plaintiff may not even call Dr. Cohen at trial, and that if Dr. Cohen does not testify at trial, the evidence before the Court in Plaintiff's case-in-chief will be the same then as it is now. Nonetheless, Defendant acknowledges that Plaintiff is not required at this time to identify the witnesses he intends to call at the trial. Given the nature of Plaintiff's arguments, the Court assumes that Dr. Cohen will be called to testify at trial; Plaintiff correctly states that the Court's "ability to gauge the relevance and reliability of an expert witness is best exercised after hearing the expert's full testimony at trial . . . ." [Doc. # 49 at 11.]

For the reasons stated above, addressing admissibility issues prior to the bench trial would be an inefficient use of resources.

## 2.    Defendant's Remaining Summary Judgment Argument

The United States further argues that even if Dr. Cohen's opinions are admissible, there is still no genuine issue of material fact for trial.  The Court disagrees.

As stated above, Dr. Cohen testified that it was his opinion that "given the suspicion of the intraoperative problem that was mentioned in the operative note, then the subsequent behavior of the eye in the follow-up visits, indicated that, obviously, something was wrong and should have been investigated with a lot more alacrity."  [Doc. # 41, Ex. 2 at 29-30.]  Dr. Cohen confirmed that his opinion of Dr. Mehan's negligence was based on the following definition of the standard of care for health care providers in Missouri: "the failure to use that degree of skill and learning ordinarily used under the same or circumstances [sic] by members of the defendant's profession."  *Id.* at 29.  Regarding causation, Dr. Cohen then testified as follows:

> I think [the delay] could have contributed to the retinal detachment and causing prolonged vitreous inflammation and additional contraction of the vitreous over that period of time, with traction on the retina.
>
> Q.  Once again, would you consider that to be more likely true than not?
>
> A. Yes.

*Id.* at 30-33.

Meanwhile, Dr. Hainsworth and Dr. Holekamp opine that it is reasonable and within the standard of care in cases of retained cortical material with good vision and medically

controlled eye pressure to wait for the referral to the vitreous and retina specialist. Dr. Holekamp also stated that Plaintiff's loss of vision in his left eye resulted from the macula-off retinal detachment.

It is unclear whether Dr. Cohen's testimony will be sufficiently credible to establish negligence and causation at trial. However, viewing the evidence in the light most favorable to the non-movant, the competing expert opinions regarding these questions present genuine issues of material fact for trial. Therefore, summary judgment must be denied.

## III.   Conclusion

Accordingly, it is hereby ORDERED that Defendant's Motion to Dismiss [Doc. # 41] and Motion for Summary Judgment [Doc. # 42] are DENIED.


 s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  April 22, 2011
Jefferson City, Missouri